UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Lisa Dwyer,

    Plaintiff

vs.

MICHELLE HALL, Esq., Director; CHARISSE LOWTHER, Department Supervisor; SONORA HARDEN, Manager; the above individuals are sued in their individual and official capacities,

    Defendants.

Case No.
Hon.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**AND**
**DEMAND FOR JURY TRIAL**

## Nature Of The Action

1. This is a 42 U.S.C. §1983 civil rights action filed by Plaintiff, seeking declaratory and injunctive relief based on constitutional and statutory violations or her First Amendment right to have attorney-client visitations in a reasonable time and place, and to have confidential visits.

## Parties

2. Plaintiff Lisa Dwyer is an attorney representing D.B., a juvenile currently in the custody of the Wayne County Juvenile Detention Facility (WCJDF).

1

3. Defendant Michelle Hall, Esq., is employed with the Wayne County Department of Health, Human and Veteran Services as the Director for WCJDF.

4. Defendant Charisse Lowther is a Department Supervisor at WCJDF.

5. Defendant Sonora Harden is a Manager at WCJDF.

6. All the Defendants are being sued in their individual and official capacities and were acting under color of state law at all relevant times.

## Jurisdiction And Parties

7. Jurisdiction in this case is conferred by Title 28 U.S.C. §1331 and §1342, that authorizes Federal Courts to hear and decide civil cases brought under Title 42 U.S.C §1983.

8. The Court has personal jurisdiction over all the defendants, because all defendants work in their official capacity in this District.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because all the defendants work in their official capacity in this District, and the events giving rise to this Complaint occurred in the Eastern District of Michigan.

10. Plaintiff is an attorney employed at the Law Office of Lisa Dwyer, P.C., which is located in the Eastern District of Michigan, and at all times relevant sought to represent D.B., who is in WCJDF's custody in this District.

## Statement Of Facts

11. On May 9, 2021, Plaintiff was retained to represent D.B., by the aunt who was his legal guardian at the time but is now a co-guardian along with her daughter, Kayla Eatmon.

12. The same day that she was retained, Plaintiff went to WCJDF for an in-person visitation with D.B. Upon arriving at WCJDF, Plaintiff was denied visitation with her client.

13. A deputy at WCJDF informed Plaintiff to contact WCJDF Supervisor, Charisse Lowther. Plaintiff called Ms. Lowther and left a voicemail, and Plaintiff also texted Ms. Lowther to follow-up.

14. Ms. Lowther returned Plaintiff's phone call and advised Plaintiff that she could not see D.B. until WCJDF received confirmation of an appearance filed with the Court.

15. Plaintiff filed her Appearance with the juvenile court.

16. On May 10, 2021, Plaintiff appeared before Judge Edward Joseph for pretrial. D.B. was not present, but the Court accepted Plaintiff's Appearance. Pretrial was set for May 24, 2021.

17. The same day as the Court's acceptance of Plaintiff's Appearance, Plaintiff texted Ms. Lowther requesting an attorney-client visit with D.B.

18. On May 11, 2021, Plaintiff emailed Ms. Lowther to schedule an attorney-client meeting with D.B. Ms. Lowther responded that the Court system did not list Plaintiff as D.B.'s attorney, and she could not visit.

19. On May 12, 2021, Plaintiff emailed Ms. Lowther a copy of her Appearance and a copy of the receipt from the Court showing her filed Appearance. Plaintiff then requested a visitation with D.B. for May 13, 2021. Ms. Lowther confirmed Plaintiff's visitation request and scheduled a visitation for May 13th at 1:00 PM.

20. On May 13, 2021, Plaintiff arrived at WCJDF for her visitation with D.B. with the expectation that WCJDF would provide a space that was conducive for a confidential attorney-client meeting. However, WCJDF staff informed Plaintiff that she would only be permitted to speak with D.B. on the pod through the small glass window cut out of his steel cell door.

21. Prior to Plaintiff attempting to speak with her client, one of the WCJDF guards moved a group of three juveniles from the pod that D.B.'s was on to the next pod over. The guard proceeded to stand in the doorway between the two pods, which was only two or three cells down from D.B.'s cell. Additionally, the cell immediately to the left of D.B.'s cell was occupied by another juvenile.

22. It was very loud on the pod during this visit, so Plaintiff first decided to write a note to pass to D.B. because she realized they would not be able to hear one another through the door while the commotion continued. Plaintiff then attempted to speak

with her client by bending down and putting her face up directly to the small slit in the door, but the two were still unable to hear one another.

23. Finally, Plaintiff loudly raised her voice while speaking to D.B. through his door, which enabled D.B. to hear Plaintiff. However, because Plaintiff had to shout to communicate with her client, she was prevented from confidentially discussing the case at any point during her visit. Additionally, Plaintiff was unable to observe her client because she had to place her mouth directly at the small slit in the door before having to stand back up to look through the window to see if he comprehended what she said.

24. On May 13, 2021, Plaintiff emailed Ms. Lowther to inquire about scheduling an in-person visit with D.B. on May 17, 2021.

25. On May 17, 2021, Plaintiff emailed Director Hall and Ms. Lowther to confirm that she would have the opportunity to visit with D.B. that afternoon. Director Hall responded granting a visitation for 2:45 PM.

26. When Plaintiff arrived at WCJDF for her visitation, she was directed to a small office where there was not enough space to pull out document to review with her client, and she was seated about three feet above D.B. Moreover, a WCJDF guard stood within a few feet of the office during the entire visitation. Consequently, Plaintiff was unable to review the case with her client because she was unable to

review documents with him and believed that the guard would hear their discussion even if they did speak about the case.

27. On May 18, 2021, Plaintiff emailed Director Hall and Ms. Lowther requesting an attorney-client visit for May 21, 2021 at 8:30 AM. Director Hall responded confirming the visitation.

28. On May 21, 2021, Plaintiff went to WCJDF for her visitation with D.B., but WCJDF only permitted Plaintiff to conduct her attorney-client visit on the pod where Plaintiff once again had to converse with D.B. through his cell door in the presence of WCJDF staff and in earshot of other juveniles. Although it was not as loud during this visit on the pod, Plaintiff still had troubles trying to communicate with D.B. Plaintiff needed to speak loud enough into the door slit so D.B. could hear her, but she also had to keep her volume low enough to avoid being heard by guards or other juveniles. These objectives could not both be achieved, so Plaintiff was unable to discuss the case with her client.

29. On May 26, 2021, Plaintiff emailed Director Hall requesting a "face-to-face" attorney-client meeting with D.B. In this email, Plaintiff also expressed her concerns regarding her inability to conduct an adequate in-person attorney-client meeting with D.B. Plaintiff explained to Director Hall that two of her visits were through D.B.'s cell door, and the remaining visit occurred in a room that was incompatible for a meeting.

30. In response to Plaintiff's email, Director Hall called Plaintiff later that afternoon. During the phone call, Director Hall mentioned that WCDJF was not permitting in-person attorney-client meetings due to staffing shortages. Plaintiff and Director Hall scheduled a meeting for May 28, 2021 to discuss Plaintiff's concerns, and Plaintiff scheduled an attorney-client visit to follow.

31. On May 28, 2021, a two-hour meeting occurred to discuss Plaintiff's concerns. The following individuals were present for this meeting: Plaintiff; Director Hall; Medical Director, Carla Scott; and Doctor Curtis Longs. Additionally, Manager Murray and Manager Harden were both present at times during this meeting.

32. During the meeting, Plaintiff stressed the importance of remembering that her client is mentally ill when determining how to handle his misbehavior. Plaintiff explained that placing D.B. in isolation may have incredibly debilitating effects on him. Director Hall responded that she had no idea that D.B. had several psychiatric diagnoses and, therefore, D.B. was being treated as a corrections issue. Director Hall then assured Plaintiff that her and her staff would reconsider how they worked with D.B.

33. At the conclusion of the meeting, Plaintiff requested to meet with D.B., which was discussed during Plaintiff's phone call with Director Hall on May 26, 2021. However, Plaintiff was refused visitation and was told that she could write a letter

to D.B. Plaintiff wrote a two-page attorney-client letter and gave the letter to Manager Harden, who said she would deliver it to D.B.

34. On June 3, 2021, Plaintiff emailed Director Hall requesting an in-person visit with D.B. as soon as possible. Plaintiff alternatively requested a private Zoom call with D.B. Director Hall responded to the email and told Plaintiff to contact Ms. Lowther to schedule an appointment.

35. On June 4, 2021, Plaintiff emailed Ms. Lowther to request a visit with D.B., and Ms. Lowther responded by scheduling a visitation for June 8, 2021.

36. On June 8, 2021, WCJDF again denied Plaintiff's opportunity for a confidential in-person meeting by only permitting Plaintiff to meet with D.B. on the pod where staff and other juveniles could hear their conversation.

37. During the June 8th meeting, D.B. disclosed to Plaintiff that he had not received Plaintiff's attorney-client letter that she wrote on May 28, 2021.

38. On June 9, 2021, Plaintiff emailed Director Hall and Ms. Lowther requesting an in-person visit with D.B. Plaintiff also inquired why D.B. never received her attorney-client letter. Ms. Lowther responded confirming a visitation for June 12, 2021, and stated that she would check with Manager Harden regarding the letter. Ms. Lowther also stated in the email that "an in person visit (without the door) would be at the discretion of the resident's behavior and management."

39. Plaintiff later learned that Manager Harden never delivered the attorney-client letter to D.B. Manager Harden claimed that D.B. would be unable to read the attorney-client letter, so she opened the letter, read it to D.B., then kept the letter in her possession.

40. Plaintiff was shocked to learn of Manager Harden's actions. Based on her knowledge and experience with D.B. and Manager Harden, Plainitff believes that Manager Harden did not think D.B. would be unable to read the letter. Instead, Plaintiff believes that Manager Harden falsely claimed D.B. could not read the letter in an effort to justify her violarion of attorney-client privilege.

41. On June 12, 2021, Plaintiff canceled the visit because she had an unexpected deadline arise on another case she was working on.

42. On June 17, 2021, Plaintiff emailed Director Hall and Ms. Lowther requesting an in-person visit for June 18, 2021. Director Hall confirmed the visit.

43. On June 18, 2021, Plaintiff was denied the in-person visitation previously agreed to and had to speak with D.B. through his door on the pod without confidentiality.

44. On June 21, 2021, Plaintiff emailed Ms. Lowther asking for D.B.'s new incident reports and questioning when she will receive an in-person visit with D.B. Ms. Lowther responded that she would get clarity on attorney-client visits from Director Hall and would follow up with Plaintiff.

45. Director Hall responded to Plaintiff's concerns regarding the lack of confidential in-person visits by emailing that "[a]ll decisions regarding visitations is made by our Administration . . . . [B]ased on safety and security factors, the interview may have to take place with the resident secured in a room. You should continue to schedule your visits and if you have concerns, please advise me."

46. On June 22, 2021, Plaintiff emailed Director Hall to explain that she does "have concerns about [her] inability to visit for private attorney-client meetings with [D.B.]" Director Hall replied that she was "astonished" by Plaintiff's email expressing concerns over in-person visitations. Director Hall denied preventing Plaintiff's access to confidential attorney-client visits and suggested a phone call to discuss Plaintiff's concerns, which was scheduled for June 24, 2021, at 9:30 AM.

47. On June 24, 2021, Plaintiff and Director Hall spoke about Plaintiff's concerns regarding the lack of confidential attorney-client meetings. During this call, Director Hall explained to Plaintiff that WCJDF did not have an appropriately sized staff to allow for private attorney meetings with D.B. because of his misbehavior. After Plaintiff explained that she was unsatisfied with that answer, Director Hall stated that they had already discussed this and proceeded to suggest that D.B. should not be at WCJDF.

48. On June 30, 2021, Plaintiff emailed Director Hall and Ms. Lowther requesting an in-person visitation with D.B. for July 6, 2021. Ms. Lowther confirmed the visit on July 1, 2021.

49. On July 6, 2021, Plaintiff went to WCJDF for her expected in-person attorney-client meeting with D.B. Again, Plaintiff was only permitted to speak with D.B. on the pod through the window in his door where their conversation could be heard by WCJDF staff and other juveniles.

50. On July 14, 2021, Plaintiff requested an in-person visit with D.B. for July 17, 2021. Ms. Lowther confirmed this visit on July 15, 2021.

51. On July 17, 2021, Plaintiff again was only permitted to meet with D.B. on the pod where they spoke through the window to D.B.'s door while WCJDF staff and other juveniles were present and in earshot of Plaintiff's conversation.

52. On July 19, 2021, D.B. was scheduled for a pretrial hearing before Judge Joseph. WCJDF did not produce D.B. for this hearing citing misbehavior the night before as the reason for again failing to produce D.B.

53. At the pretrial hearing, Plaintiff told Judge Joseph that WCJDF's treatment of D.B. was a "constitutional crisis." Judge Joseph responded that he has no authority over WCJDF, but he agreed to schedule an in-person pretrial hearing for July 28, 2021, for Plaintiff to finally conduct a confidential attorney-client meeting with D.B.

54. The Court also scheduled a bench trial set for October 19, 2021, despite Plaintiff advising the Court that she had not had the opportunity to discuss with D.B. whether he wanted a bench or jury trial.

55. On July 22, 2021, Plaintiff requested an in-person visit for July 23, 2021, and Ms. Lowther confirmed the visit.

56. On July 23, 2021, Plaintiff was only permitted to speak with D.B. through his cell door while WCJDF guards and other juveniles were within earshot.

57. On July 28, 2021, Plaintiff met D.B. at the Juvenile Hall lockup that Judge Joseph had to schedule. This was the first time Plaintiff was able to confidentially speak her client about his case.

58. On August 9, 2021, Plaintiff received a phone call from D.B. Unbeknownst to Plaintiff, a counselor at WCJDF was listening in during Plaintiff's entire conversation with her client. Plaintiff finally became aware that the counselor was listening to the conversation when, after Plaintiff had already spoken with her client for about ten minutes, the counselor interrupted to explain a timeline that Plaintiff and D.B. were discussing.

59. After the counselor finished her explanation, she urged Plaintiff to continue with the conversation. Plaintiff was in shock and did not want to continue the conversation, so she asked D.B. some brief questions and cut the call short one to two minutes after the interruption.

60. On August 17, 2021, Plaintiff arrived at WCJDF for a previously confirmed in-person meeting with D.B. Plaintiff was only permitted to speak with D.B. on the pod through his door. Plaintiff needed to discuss the progress of D.B.'s case with him, so she did so in code and hoped that D.B. would understand the information.

### COUNT 1: VIOLATION OF THE FIRST AMENDMENT: REASONABL ATTORNEY-CLIENT VISITS

61. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

62. Prior to file an appearance, Defendants denied Plaintiff's legal visit with DB for the sole reason that she had not filed an appearance.

63. An attorney is allowed by law to meet with an individual without first filing an appearance in a then pending case so that the possible client can be interviewed to determine whether to provide representation and whether that person wishes to have said attorney provide representation.

64. Defendants' actions violated the First Amendment rights of Plaintiff in interfering with the development of an attorney-client relationship.

### COUNT 2. VIOLATION OF THE FIRST AMENDMENT: REASONABLE, CONFIDENTIAL ATTORNEY-CLIENT VISITS

65. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

66. Prior to file an appearance, Defendants denied Plaintiff's legal visit with DB for the sole reason that she had not filed an appearance.

67. An attorney is allowed by law to meet with an individual without having first filed an appearance in a then pending case so that the possible client can be interviewed to determine whether to provide representation and whether that person wishes to have said attorney provide representation.

68. After being retained by D.B.'s aunt, Plaintiff sought a legal visit with D.B. so she could determine his legal status.

69. Defendants denied that legal visit saying Plaintiff had not filed an appearance in his juvenile case.

70. There is no constitutional requirement that an attorney file an appearance in a case of someone that the attorney wishes to have a legal visit with to determine the facts of the need for representation.

71. Defendants continuously denied Plaintiff in-person legal visits for no valid penological justification.

72. After Judge Edward Joseph accepted Plaintiff's Appearance as counsel for D.B. on May 10, 2021, Plaintiff attempted to schedule confidential attorney-client visits with D.B. on ten separate occasions.

73. On all ten occasions, Defendants Hall, Lowther, and/or Harden, did knowingly, intentionally, and deliberately deprive Plaintiff of her right to conduct reasonable, confidential attorney-client visitations with D.B.

74. The first and only time Plaintiff has been able to confidentially discuss the case with her client was during the meeting at the Juvenile Hall lockup that Judge Joseph had to schedule.

75. In all but one situation, Plaintiff was permitted to speak with her client only on the pod and through a small window in the cell door, where guards and other juveniles could hear their conversations.

76. On one occasion, Plaintiff was allowed to visit D.B. in a small room where she was unable to review documents with him, and a WCJDF guard stood a few feet away from the office during the entire meeting.

77. Defendants' denial of Plaintiff's ability to have legal visit with D.B. without first filing an appearance in a case violated her First Amendment right to practice law.

78. Defendants' denial of in-person legal visit with D.B. violated her First Amendment right to have meaningful communications with her client

79. Defendants violated Plaintiff's First Amendment right to have confidential legal communications with her client.

### COUNT 3: VIOLATION OF THE 1ST AMENDMENT RIGHT TO HAVE CONFIDENTIAL LEGAL MAIL WITH HER CLIENT.

80. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

81. On May 28, 2021, Plaintiff was denied the visitation with D.B. that was previously confirmed by Defendant Hall.

82. After denying Plaintiff's visitation with her client, Defendants told Plaintiff that she could write an attorney-client letter that would be delivered to D.B.

83. Plaintiff wrote a two-page attorney-client letter and gave the letter to Defendant Harden, who assured Plaintiff that the letter would be delivered to D.B.

84. During Plaintiff's June 8th meeting with D.B. on the pod, D.B. disclosed that Defendant Harden never delivered Plaintiff's attorney-client letter to him.

85. Plaintiff emailed Defendant Hall and Defendant Lowther on June 9th to ask why the attorney-client letter was never delivered to her client and to discover its whereabouts. Defendant Lowther's only response was that she will "check with Mgr. Harden regarding his letter."

86. Defendant Harden later disclosed that she did not deliver the attorney-client letter to D.B. Defendant Harden further explained that she personally read the attorney-client letter to D.B. and that she is still in possession of the letter.

87. On information and belief, Defendant Harden falsely stated that she read the attorney-client letter to D.B. because he would not be able to understand the contents of the letter.

88. Defendant Harden's failure to deliver, reading of, and continued possession of Plaintiff's attorney-client letter deprived Plaintiff of confidential communication with her client in a manner that "chills important First Amendment rights." Defendant Harden's deliberate intention to break attorney-client confidentiality between Plaintiff and her client is in violation of the First Amendment.

### COUNT 4: VIOLATION OF THE 1ST AMENDMENT: ATTORNEY-CLIENT PHONE CALLS

89. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

90. On August 9, 2021, Plaintiff received a phone call from D.B.

91. Plaintiff spoke with D.B. for approximately ten minutes under the assumption that their phone call was confidential.

92. About ten minutes into the call, a WCJDF counselor interrupted to make a comment.

93. Plaintiff was unaware that the counselor was on the other line at all points prior to the counselor's interruption.

94. Plaintiff had to cut the conversation with D.B. short after acknowledging that the counselor was listening to the entire conversation and intended to continue listening to the conversation between Plaintiff and her client.

95. The WCJDF counselor's eavesdropping on Plaintiff's conversation with her client violated Plaintiff's First Amendment right to have confidential legal communication with her client.

### RELIEF REQUESTED

WHEREFORE, Plaintiff requests this court grant the following relief:

1. To grant an injunction to require the Defendants to provide in-person legal visits unless there existed a justifiable penological reason for denying such visits.

2. To grant an injunction to require that legal visitation be allowed for any attorney without that attorney first filing an appearance for that particular client.

3. To grant an injunction to require Defendants to provide access to an area that Plaintiff can have confidential legal visitation with her clients.

4. To grant an injunction to require Defendants to provide confidential legal calls for Plaintiff to talk to her clients.

5. To grant an injunction to require Defendants to provide the letter sent by Plaintiff to her attorney.

6. To grant a trial by jury.

7. To award both compensatory and punitive damages.

8. To grant attorney fees and costs.

9. To grant any other relief that justice requires.

Respectfully submitted,


/s/ Daniel E. Manville
Daniel Manville (P39731)
Counsel for Plaintiff
Director, Civil Rights Clinic
Michigan State University College of Law
PO Box 1570
East Lansing, Michigan 48826
(517) 432-6866
daniel.manville@law.msu.edu