UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA DWYER,

      Plaintiff,

v.

MICHELLE HALL, CHARISSE
LOWTHER, and SONORA M. HARDEN,

      Defendants.

Case No. 5:21-cv-12024
District Judge Judith E. Levy
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS (ECF No. 9)

### I.    Introduction

This is a civil rights case under 42 U.S.C. § 1983.  Plaintiff Lisa Dwyer (Dwyer), an attorney representing juveniles in Wayne County, filed a complaint naming several defendants associated with the Wayne County Juvenile Detention Facility (WCJDF): Michelle Hall (Hall), Charisse Lowther (Lowther), and Sonora M. Harden (Harden) (collectively "Defendants" where appropriate).  She alleges that Defendants violated her First Amendment right to have attorney-client visitations in a reasonable time and place, and to have confidential visits.  *See* ECF No. 1.  Before the Court is Defendants' motion to dismiss.  (ECF No. 9).  This motion was referred to the undersigned, (ECF No. 10), and a hearing was held on

the motion.  For the reasons set forth below, the undersigned RECOMMENDS that

the motion be GRANTED and the case be DISMISSED.

## II.   Background

The following facts are gleaned from the complaint.

Defendants are all employees of WCJDF.  Hall is the director of WCJDF,

Lowther is a department supervisor at WCJDF, and Harden is a manager at

WCJDF.  (ECF No. 1, PageID.2).  Dwyer is an attorney who represents juveniles

in Wayne County.  *See* ECF No. 1.  At all times relevant to the allegations

contained in the complaint, Dwyer was representing a juvenile named D.B. who

was in the custody of WCJDF.  (ECF No. 1, PageID.1).

On May 9, 2021, Dwyer was retained to represent D.B. by his legal

guardian.  (ECF No. 1, PageID.3).  Upon being retained, Dwyer sought to visit

D.B. at WCJDF, but she was denied visitation with her client.  (*Id*.).  A WCJDF

deputy told Dwyer to contact Lowther.  (*Id*.).  Dwyer left a voicemail for Lowther

and sent her a text message.  (*Id*.).  Lowther called Dwyer and informed her that

she must first file an appearance with the juvenile court before she could visit D.B.

(*Id*.).  Dwyer then filed her appearance.  (*Id*.).

On May 10, 2021, Dwyer appeared in front of Judge Edward Joseph for

pretrial without D.B.  (*Id*.).  Judge Joseph accepted Dwyer's appearance and set a

pretrial for May 24, 2021.  (*Id.*).  Dwyer then texted Lowther renewing her request for a visit with D.B.  (*Id.*).

On May 11, 2021, Dwyer emailed Lowther to request a visit with D.B.  (*Id.*, PageID.4).  Lowther denied the request claiming that the court system did not list Dwyer as D.B.'s attorney.  (*Id.*).

On May 12, 2021, Dwyer emailed Lowther a copy of her appearance as well as a copy of the receipt from the court showing that the appearance was filed. (*Id.*).  Dwyer asked to visit D.B. on May 13, 2021.  (*Id.*).  Lowther accepted Dwyer's request and scheduled a visit between Dwyer and D.B. for May 13, 2021 at 1 p.m.  (*Id.*).

On May 13, 2021, the day of the scheduled visit, Dwyer arrived at WCJDF and was informed by staff that "she would only be permitted to speak with D.B. on the pod through the small glass window cut out of his steel door."  (*Id.*).  Dwyer noticed that a guard stood approximately two or three cells down from D.B.'s cell and also that the cell to the left of D.B.'s cell was occupied by another juvenile. (*Id.*).  In addition to the confidentiality concerns presented by this arrangement, Dwyer found that it was loud and difficult to communicate with D.B.  (*Id.*).  As such, she wrote a note and passed it to D.B.  (*Id.*).  Dwyer also continued to try and speak to D.B., but because of the noise, she was forced to raise her voice, which

enabled D.B. to hear her speak, but caused Dwyer concern regarding the ability of others to overhear her.  (*Id*., PageID.4-5).

Later that day, Dwyer emailed Lowther about scheduling a second visit with D.B. on May 17, 2021.  (*Id*., PageID.5).  On May 17, 2021, Dwyer emailed both Lowther and Hall regarding a visit that day.  (*Id*.).  Hall responded that Dwyer could visit D.B. at 2:45 p.m.  (*Id*.).

When Dwyer arrived for the 2:45 p.m. visit, she was directed to an office that was so small she could not even pull out documents to review with D.B.  (*Id*., PageID.5-6).  Additionally, a guard stood a few feet outside of the office during the entire visit.  (*Id*.).  Because of the guard's presence and space restrictions, Dwyer was unable to review the case with D.B.  (*Id*.).

On May 18, 2021, Dwyer emailed Lowther and Hall about scheduling a third visit with D.B. for 8:30 a.m. on May 21, 2021.  (*Id*., PageID.6).  Hall responded and confirmed the visit time.  (*Id*).

On May 21, 2021, Dwyer was once again directed to visit with D.B. though his cell door.  (*Id*.).  Dwyer believed she would be overheard if she spoke loud enough for D.B. to hear her so she left without discussing the case with D.B.  (*Id*.).

On May 26, 2021, Dwyer emailed Hall to request a "face-to-face" visit with D.B.  (*Id*.).  Dwyer also expressed her concerns over the prior visits with D.B.  (*Id*.).  Rather than respond via email, Hall called Dwyer and "mentioned that

4

WCDJF [sic] was not permitting in-person attorney-client meetings due to staffing shortages." (*Id*., PageID.7). Hall scheduled a meeting with Dwyer for May 28, 2021, to more fully discuss Dwyer's concerns. (*Id*.). Dwyer was to visit with D.B. following her meeting with Hall. (*Id*.).

On May 28, 2021, a two-hour meeting occurred between Dwyer, Hall, and numerous other WCJDF staff members. (*Id*.). Dwyer expressed her concern regarding D.B's treatment in light of his mental illness. (*Id*.). Hall responded that she was unaware "that D.B. had several psychiatric diagnoses and, therefore, D.B. was being treated as a corrections issue." (*Id*.). Hall indicated that the WCJDF staff would reconsider how they worked with D.B. (*Id*.).

After the meeting, Dwyer requested to meet with D.B., but her request was denied. (*Id*., PageID.7-8). Dwyer was told that she could write a letter to D.B. instead. (*Id*.). Dwyer then wrote a two-page letter to D.B. and gave the letter to Harden for delivery. (*Id*.).

On June 3, 2021, Dwyer emailed Hall to request either an in-person or Zoom meeting with D.B. (*Id*., PageID.8). Hall responded that Dwyer needed to email Lowther. (*Id*.). Dwyer did so and Lowther scheduled a visit for June 8, 2021. (*Id*.).

At the June 8, 2021 visit, Dwyer was only permitted to speak to D.B. through his cell door. (*Id*.). D.B. informed Dwyer that he had not received her May 28, 2021 letter. (*Id*.).

On June 9, 2021, Dwyer emailed Hall and Lowther requesting an in-person visit with D.B. and inquiring about the May 28, 2021 letter. (*Id*.). Lowther indicated that Dwyer could visit D.B. on June 12, 2021, and that she would check with Harden regarding the location of the letter. (*Id*.). Lowther stated in the email that "an in person visit (without the door) would be at the discretion of the resident's behavior and management." (*Id*.).

Dwyer eventually learned that Harden never delivered the letter to D.B. (*Id*., PageID.9). Instead, Harden opened the letter and read its contents aloud to D.B. because she felt that D.B. would be unable to read the letter. (*Id*.). Harden then kept the letter. (*Id*.).

On June 12, 2021, Dwyer cancelled her scheduled visit with D.B. because of a conflict. (*Id*.). On June 17, 2021, Dwyer emailed Hall and Lowther requesting a visit on June 18, 2021. (*Id*.). Hall confirmed the visit. (*Id*.). On June 18, 2021, Dwyer was only given the opportunity to speak with D.B. through his cell door. (*Id*.).

On June 21, 2021, Dwyer emailed Lowther requesting any new incident reports involving D.B. and asking when she would get an in-person visit with D.B.

6

(*Id.*).  Lowther indicated that she would speak to Hall and get back to Dwyer.

(*Id.*).  Hall later responded to Dwyer via email, stating that "[a]ll decisions

regarding visitations is made by our Administration. . . . [B]ased on safety and

security factors, the interview may have to take place with the resident secured in a

room.  You should continue to schedule your visits and if you have concerns,

please advise me."  (*Id.*, PageID.10).

On June 22, 2021, Dwyer responded that she did "have concerns about [her]

inability to visit for private attorney-client meetings with [D.B.]"  (*Id.*).  Hall

responded that she was "astonished" by Dwyer's concerns and scheduled a

telephone call between herself and Dwyer for June 24, 2021 at 9:30 a.m.  (*Id.*).

During the June 24, 2021 call, Dwyer and Hall discussed Dwyer's concerns.

(*Id.*).  Hall told Dwyer that because of inadequate staffing and D.B.'s misbehavior,

WCJDF was unable to facilitate private attorney meetings between Dwyer and

D.B.  (*Id.*).  Dwyer expressed her dissatisfaction with that response and Hall

responded that they had already discussed this and then suggested that perhaps

D.B. should not be at WCJDF.  (*Id.*).

On June 30, 2021, Dwyer emailed Hall and Lowther requesting an in-person

visit with D.B. for July 6, 2021.  (*Id.*, PageID.11).  Lowther confirmed the visit on

July 1, 2021.  (*Id.*).  On July 6, 2021, Dwyer was only permitted to speak to D.B.

through his cell door.  (*Id.*).

On July 14, 2021, Dwyer requested an in-person visit with D.B. for July 17, 2021. (*Id*.). Lowther confirmed the visit on July 15, 2021. (*Id*.). On July 17, 2021, Dwyer was only permitted to meet with D.B. through his cell door. (*Id*.).

On July 19, 2021, a pretrial hearing before Judge Joseph was scheduled to occur. (*Id*.). However, the hearing could not proceed because WCJDF failed to produce D.B. for the hearing alleging misbehavior the previous night. (*Id*.). Dwyer told Judge Joseph that WCJDF's treatment of D.B. was a "constitutional crisis." (*Id*.). Judge Joseph indicated that he had no authority over WCJDF, but he did schedule an in-person pretrial hearing for July 28, 2021, for the purpose of facilitating a confidential attorney-client meeting between Dwyer and D.B. (*Id*.). The court also scheduled a bench trial for October 19, 2021, despite the fact that Dwyer informed the court she had not yet had the opportunity to discuss with D.B. whether he wanted a bench or jury trial. (*Id*., PageID.12).

On July 22, 2021, Dwyer requested an in-person visit for July 23, 2021, and Lowther confirmed the visit. (*Id*.). On July 23, 2021, Dwyer was only permitted to speak to D.B. through his cell door. (*Id*.).

On July 28, 2021, Dwyer was able to have the court-facilitated visit with D.B. (*Id*.). This was their first opportunity to speak confidentially about D.B.'s case. (*Id*.).

8

On August 9, 2021, D.B. called Dwyer. (*Id*.). Approximately 10 minutes into the telephone call, an unknown counselor at WCJDF interjected thereby alerting Dwyer to the fact that the telephone call was not private as she had assumed. (*Id*.). Dwyer ended the call shortly after the interruption. (*Id*.).

On August 17, 2021, Dwyer arrived at WCJDF for a visit with D.B. (*Id*., PageID.13). Dwyer was only permitted to speak through D.B.'s cell door. (*Id*.). Dwyer spoke in code in an attempt to disguise the conversation from potential listeners. (*Id*.).[1]

On August 31, 2021, Dwyer filed the instant complaint asserting four claims against Defendants in both their individual and official capacities, as follows:

Count I - violation of the First Amendment right to reasonable visits before Dwyer filed her appearance in juvenile court;

Count II - violation of the First Amendment right to reasonable, confidential attorney-client visits after Dwyer filed her appearance in juvenile court;

Count III - violation of the First Amendment right to exchange confidential legal mail with her client;

Count IV - violation of the First Amendment right to have confidential attorney-client telephone calls, related to the August 9, 2021 phone call.

---

[1] In their brief, Defendants state that the juvenile proceedings "will likely soon be dismissed entirely due to the intervening death of the complaining witness." (ECF No. 9, PageID.41). At the hearing, counsel for Defendants confirmed that the proceedings have been dismissed.

III.    Legal Standard

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . ."). Facial plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing

explanations for the defendant's conduct." *16630 Southfield Ltd., P'Ship v.*

*Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).

## IV.   Analysis

### A.   Parties' Positions

Defendants present three arguments in support of dismissal.  First, they argue

that they are entitled to qualified immunity on the First Amendment claims under

42 U.S.C. § 1983 in Counts I, II, and III because neither the Supreme Court nor the

Sixth Circuit has clearly established the rights asserted.  Second, they argue that

Count IV must be dismissed because Dwyer has failed to allege that they had any

personal involvement in the complained of conduct.  Finally, they argue that

Dwyer has not plead an official capacity claim against Wayne County.

At the hearing, Dwyer's counsel stated she was no longer pursuing Count IV

nor was she pursuing an official capacity claim against Wayne County.  Dwyer

maintains that she has alleged a viable claim under § 1983 and that Defendants are

not entitled to qualified immunity.

### B.   42 U.S.C. § 1983

To state a claim under § 1983, a plaintiff must allege facts from which it

may be inferred that (1) he/she was deprived of a federal right, and (2) a person

who committed the alleged violation acted under color of state law. *West v. Atkins*,

487 U.S. 42, 28 (1988).  Here, there is no dispute regarding the status of the actors

11

as acting under color law; therefore, the focus is on whether Dwyer has plead that she suffered any deprivations of rights secured by the Constitution.  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### C.    Qualified Immunity

#### 1.    Legal Standard

The Sixth Circuit has held that " '[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.' " *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Individuals "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, ––– U.S. ––––, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (internal quotation marks omitted).  A court can address these requirements in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "If one is lacking, [the court] need not address the other." *Crawford*, 15 F.4th at 760.

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.' " *Id*. (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Importantly, "[i]t is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590.

### 2.    Application

As noted above, in Count I, Dwyer alleges a First Amendment violation for failure to allow reasonable attorney-client visits before she filed an appearance, in Count II, Dwyer alleges a First Amendment violation for failure to allow reasonable, confidential attorney-client visit during the pendency of D.B.'s case, and in Count III, Dwyer alleges a First Amendment violation related to Harden's conduct in reading and retaining Dwyer's letter to D.B. The question is whether these alleged First Amendment rights are clearly established.

As to juveniles, the Sixth Circuit has recognized "that incarcerated juveniles do have a constitutional right of access to the courts, and that in order to make this right meaningful the State must provide the juveniles with access to an attorney." *John L. v. Adams*, 969 F.2d 228, 230 (6th Cir. 1992). Thus, case law supports a finding that juveniles have a Sixth Amendment right to access an attorney and a Fourteenth Amendment right of access to the court.

However, the issue here relates to Dwyer's First Amendment rights. In arguing that Dwyer had a First Amendment right to visit D.B. under the circumstances as alleged in the complaint, Dwyer relies on *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636 (6th Cir. 2015). Dwyer says that this case supports her argument that the first three counts state plausible claims for violations of clearly established law. In *ACLU Fund*, the ACLU sued Livingston County and related individuals challenging Livingston County Jail's postcard only mail policy. The ACLU sent letters in sealed envelopes to inmates at the jail that were marked "Legal Mail." The jail's written policy required that all mail except "bona-fide legal mail" be on 4x6 postcards. The jail did not deliver the envelopes, deeming them not to be "bona-fide legal mail" under its policy nor did it inform the ACLU that they were not delivered.

The ACLU, suing on behalf of itself and the inmates, alleged that the jail's mail policy violated the First and Fourteenth Amendments. The First Amendment

14

claim was directed at the right of the inmates to receive legal mail.  The Sixth

Circuit held that the ACLU was likely to succeed on this claim because the letters

in question were "legal mail" and the policy failed to treat them as such.  Indeed,

courts have long held that "[a] prisoner's right to receive mail is protected by the

First Amendment."  *Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992) (citing

*Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  The Sixth Circuit has also held "that

the prisoner's interest in unimpaired, confidential communication with an attorney

is an integral component of the judicial process and, therefore, that as a matter of

law, mail from an attorney implicated a prisoner's protected legal mail rights."

*Sallier v. Brooks*, 343 F.3d 868, 877 (6th Cir. 2003).

The Fourteenth Amendment claim was directed at the right of the ACLU to

communicate with the inmates, alleging that the defendants violated their

"procedural-due-process rights by blocking delivery of the ALCU letters without

providing the ACLU or the intended recipient notice and an opportunity to contest

the decision."  *ACLU Fund*, 796 F.3d at 648.  The Sixth Circuit found that the

ACLU was likely to succeed on this claim because the defendants conceded that, if

the letters were legal mail (as the Sixth Circuit held), the ACLU's Fourteenth

Amendment procedural-due-process rights applied.  *Id.*

Here, the rights Dwyer seeks to assert may be related, but they are not

identical, to those asserted in *ACLU Fund.*  Here, Dwyer is an attorney who is

asserting a constitutional right of her own to access a client.  She is not asserting D.B.'s constitutional right of access to his attorney.  As noted above, the First Amendment right of access at issue in *ACLU Fund* was the rights of the inmates to receive mail, and the ACLU was asserting both the rights of itself and of the inmates under a third-party standing theory which Dwyer does not assert here. Indeed, in holding that the First and Fourteenth Amendment rights were implicated by the jail's mail policy, the Sixth Circuit relied only on caselaw applying to the rights of *inmates*.  It did not cite any cases concerning the rights of an *attorney*. Moreover, the decision was on a motion for a preliminary injunction not a final judgment.  It cannot be said that the Sixth Circuit's decision in *ACLU Fund* serves as clearly established law to support the First Amendment rights Dwyer asserts in the complaint.

Furthermore, as Defendants argue, the additional cases Dwyer relies upon are distinguishable as they address rights belonging to the client/inmate, not their attorney.  *Sallier*, supra, 343 F.3d at 874-878 (6th Cir. 2003) discussed an inmate's First Amendment rights to receive legal mail.  *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990) discussed an inmate's right of access to courts.  *Hydrick v. Hunter*, 500 F.3d 978, 999 (9th Cir. 2007) discussed an inmate's right to counsel and to access the court.  *John L.*, supra, 969 F.2d at 233-237, discussed a juvenile's right of access to courts, not an attorneys.

*Suciu v. Washington*, No. 12-12316, 2012 WL 4839924, at *5 (E.D. Mich.

Oct. 11, 2012) bears some similarity to this case.  In *Suciu*, the plaintiffs-attorneys

who represented or sought to represent inmates, alleged that the Michigan

Department of Corrections visitation policies restricted the ability of attorneys to

meet with and have confidential visits with their client visits.  In Count I, the

plaintiffs alleged a violation of their First Amendment right to communicate with

clients who are incarcerated In Count II, the plaintiffs allege a violation of their

First Amendment Right to associate with clients, potential clients, and/or possible

witnesses who are incarcerated in Michigan prisons.  In Count III, the plaintiffs

alleged violations of their Sixth Amendment Right of Counsel to Visit with

Clients.  In Count IV, plaintiffs alleged that their Sixth Amendment Right to

Confidential Communications was violated.  The district court focused on the

rights of the inmates and did not cite any caselaw for the proposition that attorneys

have their own standalone rights.  The district court found that the plaintiffs had

failed to plead any viable constitutional claim.  As to the First Amendment claim,

it explained:

> Although prisoners have a general constitutional right to visit with their
> legal counsel, the right is not absolute.  "Prison officials may restrict
> such attorney-client contacts through reasonable administrative rules
> and practices for the maintenance of prison security and order, provided
> the rules do not 'unjustifiably obstruct' [a] plaintiff's ability to consult
> with his attorney."  *Howard v. Cronk*, 526 F.Supp. 1227, 1229
> (S.D.N.Y.1981).  *Accord King v. Caruso*, 542 F.Supp.2d 703, 713
> (E.D.Mich.2008) (observing that "[p]rison officials may impinge on a

17

prisoner and his visitor's First Amendment rights if their actions are reasonably related to legitimate penological interest").

*Id.* at *5.  Thus, the focus was not on the rights of the plaintiffs, but that of the inmates.  *Suciu* therefore does not serve as clearly established law to support Dwyer's claims.

In short, Dwyer has pointed to no clearly established law that says an attorney has a First Amendment right to access a client in the manner alleged in the complaint.

Moreover, the Supreme Court recently emphasized the importance of specificity of clearly established law in the qualified immunity context.  In *City of Tahlequah v. Bond*, ⸺ U.S. ⸺, 142 S. Ct. 9, 11, 211 L. Ed. 2d 170 (2021), the Supreme Court noted that it "ha[d] repeatedly told courts not to define clearly established law at too high a level of generality."  It stressed that "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* (internal quotation marks and citations omitted).

In this case, Dwyer asks the Court to read the decision in *ACLU Fund* broadly to find First Amendment rights that the Sixth Circuit did not directly state in that case.  Neither *ACLU Fund* nor the other cases Dwyer relies upon support a finding that the First Amendment rights Dwyer seeks to assert in this case are clearly established such that Defendants knew or should have known that their

18

conduct was unlawful.  Put another way, there is no clearly established federal law which provides that an attorney for a juvenile in a detention facility has an independent First Amendment right under the scenarios set forth in Counts I, II, and III of the complaint.  Because the asserted rights are not clearly established, the complaint is subject to dismissal for failure to state a claim.  It also follows that Defendants are entitled to qualified immunity.

## V.    Conclusion

The undersigned is not unsympathetic to Dwyer's frustration regarding visiting D.B.  However, as Defendants' counsel noted at the hearing, WCJDF now has a written policy for attorney visits at the facility which should provide the necessary clarification and guidance regarding attorney visits.

In the end, the rights Dwyer seeks to assert simply are not clearly established under existing law.

For the reasons stated above, the undersigned RECOMMENDS that Defendants' motion to dismiss be GRANTED and the case DISMISSED.


Dated: April 25, 2022               s/Kimberly G. Altman
Detroit, Michigan                   KIMBERLY G. ALTMAN
                                    United States Magistrate Judge

19

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

20

Objection No. 2," etc.   If the court determines that any objections are without merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 25, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager